Michael **WHEELER, Individually, and in his capacity as Personal Representative for the Estate of Paula Wheeler, Plaintiff,**

v.

**NOVARTIS PHARMACEUTICALS CORPORATION, Defendant.**

No. CV 111–211.

United States District Court,
S.D. Georgia,
Augusta Division.

May 15, 2013.

1346

John A. Girardi, Girardi Keese, Los Angeles, CA, Joseph W. Watkins, Watkins, Lourie, Roll & Chance, PC, Atlanta, GA, for Plaintiff.

Anthony L. Cochran, Chilivis, Cochran, Larkins & Bever, LLP, Atlanta, GA, Kirby T. Griffis, Hollingsworth, LLP, Washington, DC, for Defendant.

## ORDER

J. RANDAL HALL, District Judge.

Presently pending before the Court is Defendant's motion for summary judgment. (Doc. no. 28.) For the following reasons, this motion is **GRANTED.**

## I. BACKGROUND

### A. Zometa and Osteonecrosis of the Jaw

Zometa is a bisphosphonate medication prescribed to patients with hypercalcemia of malignancy, multiple myeloma, or certain kinds of cancer that have metastasized to the bones. (Doc. no. 28, Ex. 5.) Zometa may reduce skeletal events that can result from these advanced cancers. (*Id.*) In 2002, the United States Food and Drug Administration ("FDA") approved Zometa as a safe and effective treatment for osteolytic bone metastases of breast cancer. (*Id.*, Ex. 6.) Zometa remains an FDA approved drug, with labeling also approved by the FDA. (*Id.*, Ex. 14.)

Osteonecrosis of the jaw ("ONJ") occurs when jaw bone becomes necrotic, or dies. (*Id.*, Ex. 16 at 4; Ex. 17 at 5.) In December 2002, Defendant received its first report that a patient who received bisphosphonate therapy had developed ONJ. (*Id.*, Ex. 19.) Within fifteen days of receiving the first ONJ report, Defendant submitted it to the FDA. (*See id.*, Ex. 20.) The alleged risk of ONJ resulting from bisphosphonate therapy was unknown prior to August 2003. (*Id.*, Ex. 21 at 5.) In September 2003, Dr. Robert Marx published the first case reports describing ONJ in Aredia and Zometa patients. (*Id.*, Ex. 22.)

On September 26, 2003, Defendant informed the FDA of its voluntary decision to revise the "Adverse Reactions" section of its Zometa labeling. (*Id.*, Ex. 23.) The revised label would provide that "[c]ases of osteonecrosis (primarily of the jaws) have been reported since market introduction." (*Id.*, Ex. 23.) In February 2004, Defendant amended the Zometa label to read that "[t]he majority of the reported [ONJ] cases are in cancer patients attendant to a dental procedure" and advised that "[a]lthough causality cannot be determined, it is prudent to avoid dental surgery as recovery may be prolonged." (*Id.*, Ex. 25.) In September 2004, Defendant again revised the Zometa label to include the following:

[ONJ] has been reported in patients with cancer receiving treatment regimens including bisphosphonates. Many of these patients were also receiving chemotherapy and corticosteroids. The majority of the reported cases have been associated with dental procedures such as tooth extraction. Many had signs of local infection including osteomyelitis.

A dental examination with appropriate preventative dentistry should be considered prior to treatment with bisphosphonates in patients with concomitant risk factors (e.g., cancer, chemotherapy, corticosteroids, poor oral hygiene).

While on treatment, these patients should avoid invasive dental procedures if possible. For patients who develop ONJ while on bisphosphonate therapy, dental surgery may exacerbate the condition. For patients requiring dental procedures, there are no data available to suggest whether discontinuation of bisphosphonate treatment reduces the risk of ONJ. Clinical judgment of the treating physician should guide the management plan of each patient based on individual benefit/risk assessment.

(*Id.*, Ex. 26.) This revision was approved by the FDA. (*Id.*, Ex. 27.)

Shortly after this revision, Defendant sent a "Dear Doctor" letter to thousands of physicians, including Dr. Mark Keaton, alerting them to the change in the Zometa label. (*Id.*, Exs. 28, 29.) In May 2005, Defendant also distributed a "Dear Dentist" letter to general practice dentists, oral surgeons, and specialists in periodontics and prosthodontics, to include Dr. Julian Murphey and Dr. Samuel D'Arco. (*Id.*, Exs. 30, 31.)

In September 2007, the Zometa label contained the following language under "Warnings and Precautions":

> [ONJ] has be en reported predominantly in cancer patients treated with intravenous bisphosphonates, including Zometa. Many of these patients were also receiving chemotherapy and corticosteroids which may be risk factors for ONJ. Postmarketing experience and the literature suggest a greater frequency of reports of ONJ based on tumor type (advanced breast cancer, multiple myeloma) and dental status (dental extraction, periodontal disease, local trauma including poorly fitted dentures). Many reports of ONJ involved patients with signs of local infection including osteomyelitis.
>
> Cancer patients should maintain good oral hygiene and should have a dental examination with preventative dentistry prior to treatment with bisphosphonates. While on treatment, these patients should avoid invasive dental procedures if possible. For patients who develop ONJ while on bisphosphonate therapy, dental surgery may exacerbate the condition. For patients requiring dental procedures, there are no data available to suggest whether discontinuation of bisphosphonate treatment reduces the risk of ONJ. Clinical judgment of the treating physician should guide the management plan of each patient based on individual benefit/risk assessment.

(*Id.*, Ex. 32.)

## B. Mrs. Wheeler's Medical and Dental History

Plaintiff Michael Wheeler is the personal representative of the Estate of Paula Wheeler, as well as Mrs. Wheeler's husband. (*See* Compl.) In October 2007, Mrs. Wheeler was diagnosed with an infiltrating ductal carcinoma in the left breast that had metastasized to the spine. (Doc. no. 28, Ex. 39; Keaton Dep. at 20–21.) In November 2007, Mrs. Wheeler's oncologist, Dr. Keaton, prescribed Zometa, as well as chemotherapy and hormonal therapy. (Keaton Dep. at 24; Doc. no. 28, Ex. 41.) Dr. Keaton specifically prescribed Zometa to reduce the risk of skeletal related events and complications from bone metastasis. (Keaton Dep. at 27,) Mrs. Wheeler received all of her Zometa infusions in Georgia, as well as all of her dental and oral surgery treatment. (Doc. no. 28, Exs. 35–38.)

Dr. Keaton was familiar with Zometa and its various possible side effects well before 2007. (Keaton Dep. at 26.) Dr. Keaton testified that when he prescribed Zometa to Mrs. Wheeler, he discussed its risks and benefits. (*Id.* at 26–27.) Dr. Keaton also testified that it was his habit and practice to discuss with patients the risk that Zometa could potentially cause ONJ, as well as that patients should not have anything done by a dentist other than cleanings and fillings without talking to him first. (*Id.* at 27, 31.)

On July 14, 2009, Dr. Murphey extracted an erupted tooth and performed a socket graft for Mrs. Wheeler. (Doc. no 28, Ex. 50; Murphey Dep. at 22.) Because Mrs. Wheeler was in pain, she did not fill out a medical history form until she was leaving

Dr. Murphey's dental practice that day. (*See* Murphey Dep. at 25.) This medical history form indicated that Mrs. Wheeler had "Zometa IV (port) every 6 w[ee]ks." (Doc. no. 28, Ex. 49; Murphey Dep. at 25.) On July 17, 2009, Dr. Murphey noted boney dehiscence on lingual # 31, and his records note it was due to "traumatic tooth loss [one] month ago." (Doc. No. 28, Ex. 51; Murphey Dep. at 31–32.) Dr. Murphey also extracted tooth # 30 and the retained root tip of tooth # 13, with socket grafts. (*Id.*)

Dr. Murphey testified that on July 20, 2009, Mrs. Wheeler informed him she was taking Zometa. (Murphey Dep. at 33.) In response to this information, Dr. Murphey informed Mrs. Wheeler that Zometa was the potential cause of her jaw problems. (*Id.* at 33–36.)

On September 11, 2009, Mrs. Wheeler visited an oral surgeon, Dr. Samuel D'Arco, who noted that Mrs. Wheeler had "[o]steonecrosis of right posterior mandible—possible BRONJ due to long term Zometa and recent [extractions]." (Doc. no. 28, Ex. 54.) Dr. D'Arco also testified that he would have informed Mrs. Wheeler of the potential correlation between Zometa and the bone death in her jaw. (D'Arco Dep. at 30.)

In August 2009, Mrs. Wheeler received her last dose of Zometa. (Doc. no. 28, Ex. 56.) On October 8, 2009, Dr. Keaton instructed Mrs. Wheeler that he was discontinuing administration of Zometa because "she had evidence of osteonecrosis of the jaw and that continuing the Zometa could worsen the condition." (Keaton Dep. at 32–33.) On July 10, 2010, Mrs. Wheeler passed away due to her metastatic breast cancer. (Doc. no. 28, Ex. 62.)

**C. Procedural History**

On December 28, 2011, Plaintiff filed suit alleging strict liability, negligent man-

ufacture, failure to warn, breach of express and implied warranty, and loss of consortium for damages associated with Mrs. Wheeler's use of Zometa. (Doc. no. 1.) On January 22, 2013, Defendant filed a motion for summary judgment. (Doc. no. 28.) To date, Plaintiff has failed to respond to the motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor." *U.S. v. Four Parcels*, 941 F.2d 1428, 1437 (1991) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Ad-*

*ickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus,* 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark,* 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick,* 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed him of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 29.) Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. Although Plaintiff failed to file any materials in opposition, the time for doing so has expired, and the motion is now ripe for consideration.

## III. DISCUSSION

Defendant seeks summary judgment on three different grounds. First, Defendant argues that Plaintiff's claims are barred by the statute of limitations. Second, Defendant argues that because Plaintiff failed to comply with the expert report requirement, he cannot prove proximate cause in this case. Finally, Defendant argues that Plaintiff cannot prove that Defendant failed to warn of the attendant risks associated with Zometa use.

### A. Statute of Limitations

As this case is a diversity action, the Court must apply Georgia's statute of limitations to determine whether the complaint is timely. *See Cambridge Mut. Fire Ins. Co. v. City of Claxton,* 720 F.2d 1230, 1232 (11th Cir.1983) ("[S]tate statutes of limitations are substantive laws and must be followed by federal courts in diversity actions."). Georgia law requires that "[a]ctions for injuries to the person shall be brought within two years after the right of action accrues ..." O.C.G.A. § 9–3–33; *see also Adair v. Baker Bros., Inc.,* 185 Ga.App. 807, 808, 366 S.E.2d 164 (1988) ("[A]n action to recover for personal injuries is, in essence, a personal injury action, and, regardless of whether it is based upon

an alleged breach of an implied warranty or is based upon an alleged tort, the limitations statute governing actions for personal injuries is controlling."); *Smith, Miller & Patch v. Lorentzson,* 254 Ga. 111, 111, 327 S.E.2d 221 (1985) (applying O.C.G.A. § 9–3–33 to products liability claims based on personal injuries); *Daniel v. Am. Optical Corp.,* 251 Ga. 166, 167, 304 S.E.2d 383 (1983) (holding that O.C.G.A. § 9–3–33 applies to personal injury actions brought under theories of strict liability and negligence). Although Plaintiff asserts claims for products liability and breach of warranty, "[t]he nature of the injury sustained in this case is an injury to the person, and O.C.G.A. § 9–3–33 therefore applies to [Plaintiff's] products liability" and breach of warranty claims. *Lorentzson,* 254 Ga. at 111, 327 S.E.2d 221 (citing *Daniel,* 251 Ga. at 167, 304 S.E.2d 383); *see also Adair,* 185 Ga.App. at 808, 366 S.E.2d 164.

■ The claims brought on behalf of Mrs. Wheeler are based upon the alleged injury to her jaw caused by the use of Zometa. Under the discovery rule, "[a] cause of action will not accrue ... until the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that the injury may have been *caused* by the defendant's conduct." *King v. Seitzingers, Inc.,* 160 Ga.App. 318, 319, 287 S.E.2d 252 (1981). This discovery rule, however, applies only in cases of a continuing tort. *McAuley v. Wills,* 251 Ga. 3, 4, 303 S.E.2d 258 (1983); *M.H.D. v. Westminster Schs.,* 172 F.3d 797, 804–05 (11th Cir.1999) ("[I]n Georgia the discovery rule only applies to cases involving 'continuing torts,' where the plaintiff's injury developed from prolonged exposure to the defendant's tortious conduct."). Continuing torts are those that result from exposure to the defendant's continuous tortious conduct and "produce[ ] injury in varying de-

grees over a period of time." *Everhart v. Rich's, Inc.,* 229 Ga. 798, 802, 194 S.E.2d 425 (1972). Because Mrs. Wheeler underwent multiple Zometa treatments, the Court will assume for the purposes of this motion that Mrs. Wheeler suffered from a continuing tort.

■ Based upon the record before the Court, Mrs. Wheeler arguably discovered her injury by July 14, 2009, when she underwent the extraction and grafting procedure on her jaw. (*See* Doc. no. 28, Ex. 50.) On July 20, 2009, Dr. Murphey informed Mrs. Wheeler that Zometa was a potential cause of her jaw injuries. (Murphey Dep. at 33–36.) On October 8, 2009, Dr. Keaton told Mrs. Wheeler that he was taking her off Zometa because it could worsen the ONJ that she was suffering. (Keaton Dep. at 32–33.) Thus, Mrs. Wheeler knew or should have known the cause of her ONJ on or before October 8, 2009 at the latest. Plaintiff, however, did not file suit until December 28, 2011, over two years after Mrs. Wheeler's October 8, 2009 visit to Dr. Keaton. (*See* Doc. no. 1.) Accordingly, Plaintiff's claims based upon Mrs. Wheeler's personal injury are untimely and barred by the statute of limitations.

■ However, "[t]he running of limitation for a personal injury claim does not bar a derivative loss of consortium claim." *Parker v. Silviano,* 284 Ga.App. 278, 280, 643 S.E.2d 819 (2007) (citing *Whitten v. Richards,* 240 Ga.App. 719, 722, 523 S.E.2d 906 (1999)). The statute of limitations for a claim of loss of consortium is four years, and thus Mr. Wheeler's loss of consortium claim was filed well within the limitation period. *See* O.C.G.A. § 9–3–33. Nevertheless, in order for Mr. Wheeler's loss of consortium claim to be valid, it must be based upon Defendant's tortious conduct. *Smith v. Tri–State Culvert Mfg. Co.,* 126 Ga.App. 508, 510, 191 S.E.2d 92 (1972)

(explaining that liability for loss of consortium is established by showing solely that the defendant has tortiously injured the consortium claimant's spouse, while damages are established as in any other tort case). As discussed below, because all of Plaintiff's claims would fail even if they were not barred by the statute of limitations, Mr. Wheeler's loss of consortium claim also fails.

### B. Strict Liability

First, Plaintiff's strict products liability claim fails. Under Georgia products liability law, a plaintiff must prove as part of his prima facie case that the defendant's product was the proximate cause of the injuries alleged. *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir.1985) (citing *Talley v. City Tank Corp.*, 158 Ga.App. 130, 134, 279 S.E.2d 264 (1981)). "As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." *Ogletree v. Navistar Int'l Transp. Corp.*, 245 Ga.App. 1, 3, 535 S.E.2d 545 (2000). In products liability cases, proof of causation generally requires reliable expert testimony which is "based, at the least, on the determination that there was a *reasonable probability* that the negligence caused the injury." *Rodrigues v. Ga.-Pac. Corp.*, 290 Ga.App. 442, 444, 661 S.E.2d 141 (2008) (emphasis added); *see also Maczko v. Employers Mut. Liab. Ins. Co.*, 116 Ga.App. 247, 250, 157 S.E.2d 44 (1967) ("The testimony must show at least a probable cause, as distinguished from a mere possible cause."). In the alternative, expert testimony stated only in terms of a "possible" cause *may* be sufficient if it is supplemented by probative non-expert testimony on causation. *Rodrigues*, 290 Ga.App. at 444, 661 S.E.2d 141.

Here, the inference that Zometa caused ONJ in Mrs. Wheeler is not a natural inference that a juror could make through human experience. *See McDaniel v. Employers Mut. Liab. Ins. Co.*, 104 Ga.App. 340, 343–44, 121 S.E.2d 801 (1961). Therefore, medical expert testimony is essential to prove causation in this case. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320 (11th Cir.1999) (applying Georgia law and finding that expert medical testimony was essential to prove that silicone breast implants caused plaintiff's systemic disease); *see also Smith v. Ortho Pharm. Corp.*, 770 F.Supp. 1561, 1565 (N.D.Ga.1991) ("Scientific testimony by expert witnesses on the issue of causation plays an increasingly vital role in [Georgia] products liability litigation."). Thus, in order to survive summary judgment, Plaintiff must have presented a competent expert who could testify "to a reasonable degree of medical certainty" that Zometa caused Mrs. Wheeler's injuries. *See Allison*, 184 F.3d at 1320.

Plaintiff failed to designate any expert witnesses to establish causation, and his time for doing so has now passed. (*See* Doc. no. 25.) Plaintiff presented no expert testimony regarding a causal relationship between Mrs. Wheeler's Zometa use and her injury in opposition to Defendant's motion. Furthermore, the Court finds nothing in the record to establish such causation. Accordingly, the Court concludes that there is no probative evidence to support a necessary element of Plaintiff's strict liability claim, and thus it necessarily fails.

### C. Negligent Manufacture

Likewise, Plaintiff's negligent manufacture claim fails. "A design defect necessarily results in all products having the defect, whereas a manufacturing defect will only occur in those products which

were improperly manufactured following design." *Rose v. Figgie Int'l, Inc.*, 229 Ga.App. 848, 853, 495 S.E.2d 77 (1997). To state a claim of negligent manufacturing, the plaintiff must show that Defendant's negligence caused a defect in the product that existed when it left the manufacturer. *Miller v. Ford Motor Co.*, 287 Ga.App. 642, 644, 653 S.E.2d 82 (2007). Here, there is no evidence in the record that the Zometa Mrs. Wheeler consumed contained a manufacturing defect. Moreover, there is no expert testimony regarding any defect. Because there is no evidence giving rise to a triable issue over whether the Zometa that Mrs. Wheeler consumed contained a manufacturing defect, summary judgment is appropriate on Plaintiff's negligent manufacture claim.

### D. Negligent Failure to Warn

 Similarly, Plaintiff's negligent failure to warn claim fails. To establish a claim for failure to warn, the plaintiff must show the defendant had a duty to warn, the defendant breached that duty, and the breach was the proximate cause of the plaintiff's injury. *Powell Duffryn Terminals, Inc. v. Calgon Carbon Corp.*, 4 F.Supp.2d 1198, 1203 (S.D.Ga.1998). The duty to warn an end user of a risk associated with product use arises when the manufacturer knows or reasonably should know of a danger arising from product use. *Chrysler Corp. v. Batten*, 264 Ga. 723, 724, 450 S.E.2d 208 (1994). In determining whether such a duty exists, the court should consider the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. *Zeigler v. CloWhite Co.*, 234 Ga.App. 627, 629, 507 S.E.2d 182 (1998). If the plaintiff fails to establish the existence of a duty to warn, the defendant is not liable.

 Defendant contends that even assuming it had a duty to warn, the learned intermediary doctrine applies to bar Plaintiff's failure to warn claims. The Court agrees. The learned intermediary doctrine modifies the general rule that imposes liability against a manufacturer for the failure to warn the end user of a known risk or hazard. *Baker v. Smith & Nephew Richards, Inc.*, No. 1:97–cv–1234, 1999 WL 1129650, at *6 (N.D.Ga. Sept. 20, 1999). Under the learned intermediary doctrine, a manufacturer is not required to directly warn the end user of dangers associated with a product's use. *Id.* For example, in the case of a prescription drug or device, "a warning ... to the prescribing physician is sufficient." *Presto v. Sandoz Pharm. Corp.*, 226 Ga.App. 547, 548, 487 S.E.2d 70 (1997).

Here, there is undisputed evidence that Dr. Keaton, Mrs. Wheeler's oncologist and prescribing physician, received Defendant's warnings regarding Zometa and its potential for causing ONJ. (Keaton Dep. at 26.) Indeed, he was familiar with the risks and benefits of Zometa. Additionally, Plaintiff has not put forth any evidence that these warnings were inadequate. Furthermore, regardless of the sufficiency of these warnings, Plaintiff still cannot recover.

Where a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been provided, courts typically conclude that the learned intermediary doctrine applies or that the causal link is broken and the plaintiff cannot recover. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 816 (11th Cir.2010).

Here, Mrs. Wheeler's treating physician testified that he was aware of the risks associated with Zometa at the time he

prescribed it to Mrs. Wheeler, that such risks were well known in the medical community, and, most significantly, that he continues to prescribe Zometa in the same manner today as he did for Mrs. Wheeler. (Keaton Dep. at 26, 38–39.) Consequently, Plaintiff's failure to warn claim does not survive summary judgment.

### E. Express and Implied Breach of Warranty

 Finally, Plaintiff's breach of warranty claims must fail. Under Georgia law, to recover for a breach of warranty, a plaintiff must show privity between himself and the defendant. *In re Mentor Corp. ObTape Transobturator Sling Products Liability Litig.*, 711 F.Supp.2d 1348, 1366 (M.D.Ga.2010); *see also Bodymasters Sports Indus., Inc. v. Wimberley*, 232 Ga. App. 170, 174, 501 S.E.2d 556 (1998). "[I]f a defendant is not the seller to the plaintiff-purchaser, the plaintiff as the ultimate purchaser cannot recover on the implied or express warranty, if any, arising out of the prior sale by the defendant to the original purchaser, such as the distributor or retailer from whom plaintiff purchased the product." *Lamb v. Ga.-Pac. Corp.*, 194 Ga.App. 848, 850, 392 S.E.2d 307 (1990).

Here, Plaintiff fails to even allege that Mrs. Wheeler purchased Zometa from Defendant, and there is no evidence of any such purchase. Due to a lack of privity, Plaintiff's breach of warranty claims must fail. *See Baker*, 1999 WL 1129650, at *8.

### F. Derivative Claims

As stated above, because Mr. Wheeler's loss of consortium claim is derivative to his wife's other claims, the inability of Plaintiff to recover on any claims related to Mrs. Wheeler's personal injury means that Mr. Wheeler's loss of consortium fails as well. *Id.* at *9.

### IV. CONCLUSION

Based upon the foregoing, Defendant's motion for summary judgment (doc. no. 28) is **GRANTED.** The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk **SHALL** terminate all deadlines and motions and **CLOSE** the case.